IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
)
)
v. ) 1:10MJ90-1 (M.D.N.C.)
) 3:10CR170-22 (E.D. Va.)
)
JAMIE TOWNSEND, a/k/a Vern )

## MEMORANDUM OPINION AND ORDER

This case came before the Court on June 21, 2010, for a hearing on a Motion for Detention by the United States, pursuant to 18 U.S.C. § 3142(f)(1)(A) and (E). After receiving evidence and hearing argument, the undersigned United States Magistrate Judge announced in open court that the defendant, Jamie Townsend, a/k/a Vern, would be detained pending disposition of the charges against him, pursuant to 18 U.S.C. § 3142(e)(1), because clear and convincing evidence established that no condition or combination of conditions of release would reasonably assure the safety of other persons and the community. The Court now enters this written order memorializing that ruling as required by 18 U.S.C. § 3142(i)(1).

BACKGROUND

A federal grand jury for the Eastern District of Virginia indicted the defendant (along with 26 others) for participating in a RICO (Racketeer Influenced Corrupt Organizations) Conspiracy, in violation of 18 U.S.C. § 1962(d), and for participating in a VICAR (Violent Crime in Aid of Racketeering) Conspiracy, in violation of

18 U.S.C. § 1959(a)(6).[1] As to the RICO Conspiracy, the indictment alleges that the underlying pattern of racketeering activity included acts indictable under 18 U.S.C. §§ 1512(b)(3) (witness tampering), 1951(a) (extortion), and 1955 (operating an illegal gambling business), and 26 U.S.C. §§ 841(a)(1) (drug distribution) and 856(a)(2) (maintaining drug-involved premises), as well as acts involving murder, arson, kidnapping, robbery, and extortion as proscribed by state law. The indictment identified the racketeering activity underlying the VICAR Conspiracy as including acts involving murder, robbery, extortion, and drug trafficking in violation of federal and/or state law.

The indictment identifies the time period of the RICO Conspiracy as from in or about 2005 to June 10, 2010, and the time period of the VICAR Conspiracy as from in or about March 2006 to June 10, 2010. Both charges revolve around the activities of the American Outlaw Association ("the Outlaws"), a group identified as a highly-organized, criminal motorcycle gang. The indictment charges that the defendant is a member of the Outlaws and the president of the chapter based in Lexington, North Carolina, which forms part of the gang's Copper Region, which encompasses the seven chapters located in Virginia, North Carolina, and South Carolina.

According to the indictment, the Outlaws seek to control the geographic territory near gang chapters to collect more member dues and pursue this agenda by conspiring to commit acts of violence

---

[1] The indictment also contains additional counts charging various substantive offenses, but none of those counts name the defendant.

against other gangs (including, most prominently, the Hell's Angels Motorcycle Club ("the Hell's Angels")), as well as people or groups affiliated with such rivals. This alleged conspiracy included possession of firearms in connection with crimes of violence and provision of firearms to Outlaws' members prohibited from such possession (including by maintaining firearms in member-accessible areas of chapter clubhouses). Allegations in the indictment also describe how the Outlaws engaged in drug distribution, extortion, and illegal gambling to benefit the enterprise and its members. The indictment further alleges that the conspiracy involved obstruction of justice, including through the provision of false information designed to impede the investigation and prosecution of members and by intimidating or retaliating against witnesses who cooperated with the criminal justice system. Finally, the Outlaws allegedly conspired to reward members who carried out racketeering activities and to punish members who did not.

Prior to the detention hearing, a United States Probation Officer assigned to the Pretrial Services Unit prepared a report regarding the defendant's history, residence, and family ties, his employment history and financial resources, his health (including as to mental health and substance abuse issues), and his prior record. Both parties had an opportunity to review that report before the hearing. At the hearing, the defendant stipulated to the accuracy of the factual information in the report.

In addition, at the inception of the hearing, the Court advised the parties that it intended to consider the affidavit of

a federal law enforcement agent submitted in support of a search warrant application for the defendant's residence (Case No. 1:10MJ81 (M.D.N.C.)) and then took a recess to allow the parties as much time as they wished to review said affidavit. Once the parties gave notice that they were ready to proceed, the Court received credible testimony from the federal law enforcement agent who submitted the above-referenced affidavit (and served as the case agent for the investigation underlying the indictment). Said agent testified, among other things, about the reports he received regarding the execution, on June 15, 2010, of search warrants at the defendant's residence and the Outlaws' clubhouse in Lexington. Finally, the Court heard testimony from Kimberly Vizzini, who identified herself as the fiancé of Harold Herndon (another defendant charged in the instant indictment).[2]

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the foregoing record, the Court makes the following findings of fact and conclusions of law regarding the factors identified in 18 U.S.C. § 3142(g):

1) The offenses charged against the defendant constitute crimes of violence, involve controlled substances, and involve firearms (irrespective of the absence of allegations in the indictment that he personally committed acts of violence or acts involving controlled substances or firearms). See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (ruling that defendant

---

[2] The Court conducted a joint hearing as to the defendant and Herndon.

indicted for RICO Conspiracy involving racketeering activity that included crime of violence, such as extortion, was charged with "crime of violence" under Bail Reform Act of 1984, notwithstanding fact that indictment did not allege defendant personally committed any such violent act), cited with approval in United States v. Ayala, 601 F.3d 256, 267 (4th Cir. 2010) (holding that RICO Conspiracy predicated on "pattern of violent racketeering activities, including murder, kidnapping, and robbery" constituted "crime of violence" under 18 U.S.C. § 924(c)).

Because of their statutorily-mandated importance, see 18 U.S.C. § 3142(g)(1) (identifying issue of "whether the offense is a crime of violence . . . or involves a controlled substance [or] firearm" as required part of assessment of "nature and circumstances of the offense charged"), these facts weigh heavily against release. See United States v. Stone, ___ F.3d ___, ___, 2010 WL 2499658, at *4 (6th Cir. 2010) ("In terms of dangerousness, Congress also thought it was especially significant if the charges include 'a crime of violence, . . . a Federal crime of terrorism, . . . or involve[] a . . . firearm, explosive, or destructive device.'" (brackets and ellipses in original)); United States v. Coleman, No. 5:01CR77, 2001 WL 1249682, at *4 n.2 (N.D.N.Y. July 24, 2001) (unpublished) ("Congress has made it clear that the nature of the crime as one of violence is an important consideration, particularly on the issue of dangerousness.").

2) The offenses charged against the defendant are, as a categorical matter, serious in nature and indicative of danger to

the safety of other persons and the community. See <u>Ayala</u>, 601 F.3d at 266 ("[T]he VICAR statute addresses the particular danger posed by those . . . who are willing to commit violent crimes in order to bolster their positions within [racketeering] enterprises."); <u>United States v. Boidi</u>, 568 F.3d 24, 32 (1st Cir. 2009) (noting that "RICO, of course, is a serious crime"); <u>United States v. Gambino</u>, 818 F. Supp. 541, 547 (E.D.N.Y. 1993) (holding that RICO Conspiracy offense is "serious in that [it] is punishable by imprisonment for twenty years").

The specific racketeering activities underlying the conspiracy charges are, as a categorical matter, serious in nature and indicative of a risk of danger. See <u>United States v. Caro</u>, 597 F.3d 608, 624 (4th Cir. 2010) ("[I]llegal drugs have long and justifiably been associated with violence."); <u>United States v. Williams</u>, 576 F.3d 1149, 1158 (10th Cir. 2009) ("Being a felon in possession of a firearm is a serious offense."); <u>United States v. White</u>, 571 F.3d 365, 373 (4th Cir. 2009) (holding that conspiracy to commit robbery with dangerous weapons, even absent any charged overt act, constitutes "a dangerous type of crime that creates a serious potential risk of physical injury to another" (internal brackets and quotation marks omitted)); <u>United States v. Mir</u>, 525 F.3d 351, 355 (4th Cir. 2008) (characterizing witness tampering as "serious offense"); <u>Barapind v. Enomoto</u>, 360 F.3d 1061, 1065 (9th Cir. 2004) (describing "conspiracy to commit murder" as "serious" crime); <u>United States v. Brandon</u>, 247 F.3d 186, 191 (4th Cir. 2001)

(quoting with approval Ninth Circuit's statement that "the danger of violence inheres in the combination of firearms and drugs").

As a result, "the nature and circumstances of the offense[s] charged," 18 U.S.C. § 3142(g)(1), "certainly weighs in favor of detaining [the defendant] pending trial," United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (endorsing decision that "RICO conspiracy . . . involving predicate acts of murder, conspiracy to murder, and the manufacture and possession with intent to distribute drugs" was "very serious" and that the first factor under 18 U.S.C. § 3142(g) therefore supported detention).

3) The evidence before the Court (from the case agent's affidavit and testimony) reflects, consistent with the allegations in the indictment, that the defendant is (and, during the course of the investigation, has been) the president of the Outlaws' chapter in Lexington. Although the mere fact of an individual's association with (and even leadership of) a violent enterprise does not per se warrant detention, see Ciccone, 312 F.3d at 543; United States v. Patriarca, 948 F.2d 789, 795 (1st Cir. 1991), such association does bear on the risk of danger inquiry, see United States v. Tortora, 922 F.2d 880, 885 & n.6 (1st Cir. 1990). In particular, "[e]vidence of [a] defendant['s] leadership role is relevant in evaluating the nature of the charges . . . and the seriousness of the danger that his release would pose . . . ." United States v. Shea, 749 F. Supp. 1162, 1169 (D. Mass. 1990).

4) Evidence from the case agent's affidavit and testimony as to the method of operation of the Outlaws illustrates the

-7-

particular relevance of the defendant's leadership position in assessing the nature and circumstances of the offense (as it pertains to the risk of danger) in this case; specifically:

The national president of the Outlaws and the membership-elected regional presidents make decisions regarding matters such as ordering acts of violence against rival gangs. These binding directives are conveyed through regional leaders back to chapter leaders and then to rank-and-file members. This method of operation tends to confirm that the defendant was fully aware of the violent objectives of the Outlaws. His knowing participation as an enterprise leader under such circumstances strongly indicates that his release would endanger other persons and the community.

Further, the Outlaws reward members who carry out the enterprise's objectives and punish members who do not. In addition, the Outlaws popularly elect the enterprise's leaders. Given these facts, it would be unreasonable to believe that the defendant could become a leader of the Outlaws without affirmatively supporting violent conduct.

Finally, because of his leadership position, the defendant could more easily overcome the restraining effects of release conditions to achieve the Outlaws' objectives, such as obstruction of justice, as well as to continue to promote violence against rival gangs, by directing the actions of others. See United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) ("[T]hese conditions may serve as inconveniences, but they do not hinder [the defendant's] alleged ability to supervise an illegal enterprise.").

The fact that the case agent's affidavit documents the Outlaws' commitment to retaliate against persons who cooperate with the criminal justice system and that this case involved multiple undercover law enforcement agents and confidential informants heightens the "nature and seriousness of the danger to [other] persons [and] the community that would be posed by the [defendant's] release," 18 U.S.C. § 3142(g)(4).

5) The case agent's affidavit and testimony establish that, during the time period of the indictment, the Outlaws (including members from chapters in the Copper Region) have engaged and attempted to engage in acts of violence against rival gangs. In addition, the case agent testified that, on June 15, 2010, during the execution of arrest and search warrants related to this indictment, at least one of the indicted Outlaws instigated a shoot-out. A law enforcement officer was struck by a round (though he fortunately was protected by body armor) and one of the indicted Outlaws was shot dead. These facts demonstrate that the risk of danger in this case, including obstruction of justice by violence, is demonstrably greater and more serious than the risk of danger that arises, by operation of predictive inference alone, in a conspiracy of this sort. In other words, the fact that the Outlaws have actually (and recently) carried out the very kind of violence one might anticipate when individuals enter into this type of conspiracy makes "the nature and circumstances of the offense[s] charged," 18 U.S.C. § 3142(g)(1), more grave than a truly inchoate crime and more strongly indicative of the need to detain the

defendant because of the "nature and seriousness of the danger," 18 U.S.C. § 3142(g)(4), his release would pose.

6) The case agent's affidavit and testimony show that, during the time period of the indictment, the defendant was actively participating in the Outlaws' enterprise, including engaging in the gang's illegal activities (specifically, drug distribution, promotion of illegal gambling, and unlawful possession of firearms). These facts, relevant to "the nature and circumstances of the offense[s] charged," 18 U.S.C. § 3142(g)(1), and "the nature and seriousness of the danger to any person and the community that would be posed by the [defendant's] release," 18 U.S.C. § 3142(g)(4), bolster the view that the defendant is directly and substantially involved in the Outlaws' enterprise and thus more likely, if released, to continue its dangerous illegal activities.

7) Based on the case agent's affidavit and testimony, the Court finds that the instant indictment arose from a lengthy investigation carried out with the assistance of uniquely-placed undercover law enforcement agents; specifically:

In 2008, as part of a national investigation into the Mongols Motorcycle Club ("the Mongols"), two undercover agents working with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("the ATF") became Mongols in the Virginia/Maryland area. Late in 2008, federal charges were brought against the Mongols, but such charges were primarily targeted at the Mongols' membership in the western United States. This scenario created two phenomena that enabled the ATF to achieve a high-level penetration of the Outlaws. First,

the two undercover agents operating as Mongols in the Virginia/ Maryland area were not compromised, but could remain in their established undercover roles.  Second, the Outlaws apparently saw the disarray caused to the Mongols by the federal prosecution as an opportunity to further the Outlaws' ongoing effort to build the enterprise's membership base in Virginia (where, as recently as 2006, the gang had not held any territory).  These two phenomena came together when an Outlaws' chapter in Virginia began recruiting Mongols, including the two undercover agents, to switch their affiliation from the Mongols to the Outlaws.

The two undercover agents used this opportunity to secure a meeting with Outlaws' leaders, including the national president and the then-Copper Region president.  As a result of that meeting, the Outlaws agreed to allow the two undercover agents to establish a new Outlaws' chapter in Virginia (and to recruit members).  This development permitted the ATF to embed another undercover agent and two confidential informants among the Outlaws.  By mid-2009, this newly-established Outlaws' chapter gained full status with undercover agents and confidential informants as chapter leaders.

The ATF thereafter had direct access to meetings held and information shared between the highest levels of the Outlaws' leadership.  This penetration, the most significant ever achieved by law enforcement into one of the four largest criminal motorcycle gangs, allowed the United States to gather direct evidence about the workings of the Outlaws' enterprise, the identity and roles of its leaders, and the criminal activities and plans of the

enterprise. The undercover agents traveled to Outlaws' clubhouses throughout the Copper Region, including Lexington, and interacted extensively with members and leaders of the Outlaws in the region.

Through this access, the undercover agents personally witnessed conspiratorial and racketeering activity by the Outlaws' enterprise. They received solicitations from members of the Outlaws to commit perjury and to lie to a defense attorney about an assault committed by an Outlaw. They heard Outlaws' members discuss the creation of a false alibi in connection with a planned shooting. They participated in a confrontation instigated by members of the Outlaws as part of a plan to assault members of the Hell's Angels. They observed an Outlaws' member carry out an assault against a member of a smaller motorcycle gang. They received directions from the then-Copper Region president to murder Hell's Angels' members. They were present on multiple occasions when leaders of the Outlaws instructed members to seek out, to assault, and to rob members of the Hell's Angels. They heard members of the Outlaws discussing specific planned assaults, some involving firearms and explosives. They received an order from the Outlaws' national president to shoot members of the Hell's Angels. They observed drug use and distribution by Outlaws' members. They witnessed Outlaws' members possessing firearms and providing firearms to prohibited persons. They saw members of the Outlaws possessing a firearm in the Lexington clubhouse.

Finally, the undercover agents verified the defendant's role as the president of the Outlaws' chapter in Lexington and observed

him at leadership (and member-wide) meetings. The undercover agents worked directly with the defendant to secure the transportation of gambling machines from North Carolina to Virginia for use by the Outlaws' enterprise and to coordinate the division of proceeds from that activity. They also dealt directly with other members of the Outlaws' chapter in Lexington to arrange distributions of marijuana and cocaine. One of these members explained to the undercover agents that, during the time he was attempting to become a full member of the Lexington chapter, he had to "turn over" his marijuana supply source to the defendant. The undercover agents thereafter observed the defendant distribute a small quantity of marijuana to another Outlaws' member and discussed acquisition of marijuana directly with the defendant.

These facts support a finding that "the weight of the evidence against [the defendant]," 18 U.S.C. § 3142(g)(2), is very strong, particularly as to the character of the Outlaws as an enterprise whose members conspired to engage in racketeering activity as alleged in the indictment, as to the leadership structure and method of operation of the Outlaws, and as to the defendant's knowing participation in and leadership of a criminal enterprise, including through involvement in drug distribution.

8) At the detention hearing, the case agent testified that, on June 15, 2010, law enforcement officers executed a search warrant at the Outlaws' Lexington clubhouse. According to the case agent, during that search, officers seized a loaded firearm stored with an extra loaded magazine behind the bar in an area accessible to all

-13-

members. This testimony corroborates evidence in the case agent's affidavit, increases the weight of the evidence against the defendant for purposes of 18 U.S.C. § 3142(g)(2), and underscores the nature and seriousness of the danger posed by the defendant's release pursuant to 18 U.S.C. § 3142(g)(4). Given the strong evidence that the defendant is (and has been) the president of the Lexington chapter, it is reasonable to infer that he had knowledge and constructive control of the seized firearm. As noted above, the evidence also strongly shows that the defendant and other chapter members are involved in drug distribution in and around the Lexington clubhouse. As the United States Court of Appeals for the Fourth Circuit has recognized, "the danger of violence inheres in the combination of firearms and drugs." Brandon, 247 F.3d at 191.

9) The defendant's criminal history reflects prior felony drug convictions. This fact, which concerns the defendant's "past conduct . . . [and] criminal history," 18 U.S.C. § 3142(g)(3)(A), bears upon "the history and characteristics of the [defendant]," 18 U.S.C. § 3142(g)(3), in a manner that raises concerns regarding the safety of others and the community posed by the defendant's release, particularly in light of the current allegations of the defendant's involvement in drug distribution and his constructive possession of a firearm at the Lexington clubhouse. See United States v. Williams, 753 F.2d 329, 333-35 & n.13 (4th Cir. 1985) (recognizing that risk of continued drug-dealing constitutes danger to the community within meaning of 18 U.S.C. § 3142 and citing defendant's prior conviction for drug offense and defendant's

-14-

firearm possession at time of arrest as factors relevant to decision to overturn district court's release order).[3]

10) The remaining considerations related to the defendant's "history and characteristics" listed in 18 U.S.C. § 3142(g)(3)(A) shed little, if any, light on the risk of danger analysis. The defendant reports good health. He has some recent employment history, but also recent periods of unemployment. Although the defendant has apparent family ties and long-time residency in the Lexington area, that consideration would bear only on the risk of flight determination. No basis exists for the Court to infer that the defendant's family ties or residency history suddenly would dissuade him from engaging in criminal activity and thereby endangering others and the community, given that these matters have had no such effect in the past. Finally, nothing remarkable appears regarding the defendant's "financial resources," 18 U.S.C. § 3142(g)(3)(A), the defendant has not identified any "community ties," id., and, even if he had, that consideration, like his "record concerning appearance at court proceedings," id., would bear only on the issue of risk of flight, not danger.

In sum, the Court concludes that all of the statutorily-mandated factors, i.e., the nature and circumstances of the charged offenses, the weight of the evidence against the defendant, the

---

[3] The defendant also has a prior conviction for possession of drug paraphernalia and the case agent testified that, on June 15, 2010, law enforcement officers recovered drug paraphernalia from the defendant's residence. These facts indicate that the defendant may abuse drugs and thus bear negatively on another statutorily-identified consideration. See 18 U.S.C. § 3142(g)(3)(A).

-15-

history and characteristics of the defendant, and the nature and seriousness of the danger that the defendant's release would pose, weigh in favor of detention. The record establishes by clear and convincing evidence that no condition or combination of conditions (including his proposed placement on home confinement with his 20-year-old daughter as third-party custodian and the posting of a small bond) would reasonably assure the safety of others and the community. The Court's conclusion in this regard stems primarily from a determination that, if released, the defendant would not refrain from engaging in dangerous criminal activity, including drug distribution and participation in the Outlaws' enterprise.

**IT IS THEREFORE ORDERED** that the Motion for Detention by the United States is GRANTED and the defendant shall be detained pending disposition of the instant charges pursuant to 18 U.S.C. § 3142(e)(1). The defendant is committed to the custody of the Attorney General of the United States or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the

United States Marshal for the purpose of an appearance in connection with a court proceeding.

                                    /s/ L. Patrick Auld
                                    **L. Patrick Auld**
                            **United States Magistrate Judge**
June 25, 2010